UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

DILLARD L. SUMNER, JR.,

     Plaintiff,

v.                              Civil Action No. 3:15cv42

MARY WASHINGTON HEALTHCARE
PHYSICIANS d/b/a MARY WASHINGTON
HEALTHCARE, *et al.*,

     Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] filed by Defendant Mary Washington Healthcare Physicians ("MWHP"). (ECF No. 40.) Plaintiff Dillard L. Sumner, Jr. responded, and MWHP replied. (ECF Nos. 43, 44.) The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2] The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons that follow, the Court will grant the Partial Motion to Dismiss.

### I. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

---

[1] Federal Rule of Civil Procedure 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[2] Section 1331 defines federal question jurisdiction as follows: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted).  Instead, a plaintiff must assert facts that rise above speculation and conceivability to those that "show" a claim that is "plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 570; Fed. R. Civ. P. 8(a)(2)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted).

## II. Procedural and Factual Background

### A.  Summary of Allegations in the Complaint[3]

#### 1.  Sumner and Wall's Working Relationship

In July 2007, MWHP hired Sumner as the "Director, Compensation and Benefits &
HRIS." (Second Am. Compl. ¶ 32.)  Sumner reported directly to Bob Jensen, the Director of
Human Resources for MWHP.  Defendant Kathryn Wall was the Executive Vice President of
Human Relations for MWHP.  Sumner was "extremely qualified" for the Compensation and
Benefits role. (*Id.* ¶ 34.)  Wall, however, made professional errors that Sumner would not have
made, (*see, e.g., Id.* ¶¶ 39, 42), because her degree in art history and background in
organizational development "did not adequately prepare her" for her "job responsibilities." (*Id.*
¶ 54).  On at least one occasion in early 2012, Wall's inexperience and "inability to comprehend"
the Compensation and Benefits arena, caused her to "set inaccurate or difficult timelines," for a
project. (*Id.* ¶ 52).

The Second Amended Complaint describes, in thirty-six pages, the seven-year working
relationship between Sumner and Wall.  Throughout late 2007 and early 2008, Wall "disregarded
[Sumner's] advice" that employees had to be compensated for volunteer events. (*Id.* ¶ 38.)
From March to December 2008, Wall "was constantly at odds" with Sumner regarding MWHP
employee salaries, setting salaries without consulting Sumner, and "intentionally circumventing
[Sumner] by making offers" Sumner did not believe were prudent. (*Id.* ¶ 39.)  In 2008, when
Sumner developed a "market merit structure methodology" system that did not align with Wall's

---

[3] For purposes of this motion, the Court assumes the well-pleaded factual allegations in
the Complaint to be true and views them in the light most favorable to Sumner. *See Matkari*,
7 F.3d at 1134. The Court presumes familiarity with the procedural and factual background of
this case as summarized in an April 28, 2015 Memorandum Opinion and Order and its March
Opinion and Order. (ECF Nos. 27, 28.)

expectations, Wall became "visibly upset" with him. (*Id.* ¶¶ 40–41.) In later years, Wall twice "unilaterally overrode" Sumner's "market merit structure methodology" system, (*Id.* ¶ 40), and at one point "attempted to remove salary determination from Mr. Sumner's control," (*Id.* ¶ 45). During 2009, Sumner and Jensen disagreed regarding salary quotes for employees at a new MWHP hospital. Although Jensen's policies violated "guidelines," Wall "always supported" Jensen over Sumner. (*Id.* ¶ 42.) Between 2010 and 2012, Sumner's department lost three Compensation Analysts whose work Wall told Sumner to "assume," resulting in six or seven day workweeks. (*Id.* ¶ 59.)

"Beginning in mid-2012," Sumner noticed that Wall "treated him differently that [sic] she did the other directors," meeting with him less often. (*Id.* ¶ 47.) Wall also displayed a "complete lack of interest" in Sumner's department. (*Id.* ¶ 48.) She "made no effort, whatsoever to check with Mr. Sumner regardless of his efforts or health," (*Id.* ¶ 91), and did not respond to Sumner's emails while she was on vacation, although she did respond to other employees' emails, (*Id.* ¶ 97). Wall also failed to recognize Sumner's "outstanding efforts" on a substantial project. (*Id.* ¶ 67.)

Wall "routinely circumvented" Sumner by sending requests to his employees instead of him, ignoring his decisions altogether, (*Id.* ¶ 48), or "exclud[ing] Mr. Sumner from issues affecting his department," (*Id.* ¶ 51). Wall once reassigned one of Sumner's associates without consulting or discussing it with Sumner. (*Id.* ¶ 51.) Wall's "circumvention" of Sumner continued throughout his employment at MWHP, including one instance when she "resisted Mr. Sumner's advice by not implementing a procedure for clocking meal times." (*Id.* ¶ 64.)

4

### 2.    Sumner's 2012 and 2014 Leave for Diabetes-Related Surgeries

Sumner has been diabetic for over 20 years, although Wall only became aware of Sumner's illness before his October 2012 surgery. In October 2012, Sumner developed a bone infection in his right foot. Knowing the infection would require surgery, Sumner told Wall about his health issues, including his diabetes. Sumner requested, and was granted, six weeks' leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C § 2601, *et seq.*, for the surgery and the ensuing diabetes-related complications. Despite minimal staffing, Sumner's department met most deadlines on time and fell only slightly behind during his absence on this 2012 FMLA leave. Cost-cutting measures at MWHP continued through February 2014, when Sumner faced the decision whether or how to eliminate one part-time and two full-time employees.

On March 5, 2014, Wall received a list of "High Risk Individuals" under the company's health plan, a document naming individuals with higher risk profiles and therefore higher health care premiums. Because Sumner possessed three of the four major factors identified as "high risk," the list classified Sumner as a "substantial risk." (*Id.* ¶ 69.)

Just afterward, in mid-March 2014, Sumner developed a bone infection in his left foot that necessitated another surgery. When Sumner told Wall about the need for surgery, she "expressed concern over the amount of work to be done." (*Id.* ¶ 86.) Sumner "felt pressured" by this comment, and it was the "main factor" in Sumner delaying his surgery by a week. (*Id.* ¶¶ 72, 86.)

During the delay, Sumner worked to "properly brief" Wall and his department; to "transition work in progress in anticipation of his upcoming absence"; and, to "perform further work on projects [Wall] . . . had indicated had to be completed." (*Id.* ¶ 72.) Also during the delay, Sumner joined one meeting by phone in lieu of walking to the conference room because

he needed to remain seated with his leg elevated. (*Id.* ¶ 74.) "[D]espite being aware of his underlying medical condition," his "[then-]current medical condition caused by the bone infection," and his "work ethic in delaying his surgery for work," Wall verbally reprimanded Sumner for not attending the meeting in person. (*Id.* ¶ 74.) Before leaving for surgery, Sumner told Wall that he anticipated "additional recovery time due to the severity of the infection and the resulting, related medical complications." (*Id.* ¶ 75.) Wall responded that if Sumner "could not delay the surgery, he had to get back to work as quickly as possible." (*Id.* ¶ 75.)

The surgery and ensuing complications required Sumner to remain in the hospital from March 20, 2014, through March 29, 2014. He recovered at home, on approved FMLA leave, for six weeks, during which time he attempted to "join at lest [sic] one meeting by phone." (*Id.* ¶ 77.) He also stayed in contact with his group and remained available by phone. Given the pressure he felt, Sumner worried more about missing work than he did about his medical condition and recovery.

### 3.   <u>Return from 2014 FMLA Leave</u>

On April 28, 2014, continuing his FMLA schedule on an approved schedule, Sumner returned to work on a limited basis of 20 hours per week as ordered by his doctor.[4] This modified schedule was to last two weeks. However, Wall assigned Sumner "an increased work load" that prevented Sumner from adhering to the half-day schedule. (*Id.* ¶ 78.) Wall also "became extremely annoyed" with Sumner when he was late to work one morning due to post-

---

[4] Although Sumner does not specifically allege that he *requested* to return to work on a modified schedule following his second surgery, he states that he was *granted* that accommodation. (Second Am. Compl. ¶ 78 ("Mr. Sumner returned to work on April 28, 2014, on a limited basis (20 hours per week) for the first two weeks, per doctor's orders.")). MWHP concedes that he requested—and was granted—a modified work schedule of 20 hours per week after he returned from his second FMLA leave in 2014. (Def.'s Mot. Dismiss 7.)

surgery medical complications. (*Id.* ¶ 79.) Sumner does not say that he told Wall that the increased work load required work beyond the modified 20-hour schedule, or that Sumner requested additional staff or extended deadlines in order to adhere to this FMLA reduced schedule.

On April 29, 2014, the day after Sumner returned from leave, Wall presented him with a Performance Improvement Plan ("PIP") that "addressed multiple areas of alleged performance deficiencies for which [Sumner] had not been previously counseled or spoken to about." (*Id.* ¶ 82.) Although the "normal procedure" was for PIPs to accompany a "Needs Development" performance evaluation, Sumner had never received such an evaluation. (*Id.* ¶ 83.) Sumner had previously received positive performance evaluations for each year of his employment, including ratings of "Successful" for years 2008 through 2011 and a rating of "Exceeds Expectations" for 2012. (*Id.* ¶ 93.) MWHP did not conduct a performance evaluation for Sumner in 2013.

In the PIP, Wall "accused Mr. Sumner of not communicating with her about his medical leave" and not providing adequate orientation for a new compensation analyst. (*Id.* ¶¶ 86, 90.) Sumner states that he did communicate with Wall directly, "during a one-on-one meeting prior to his leave," (*Id.* ¶ 86), and that he informed Wall's assistant about his leave, "knowing that she would (and did) remind Ms. Wall." (*Id.* ¶ 87.) Sumner also states that he "personally provided training" for the new compensation analyst, and even checked in with her daily during his hospital stay and recovery. (*Id.* ¶ 90.) Sumner charges that Wall wrote the PIP in retaliation for his exercising rights under the FMLA in April 2012 and March 2014, and in an attempt to prepare to terminate Sumner because of his disability. (*Id.* ¶¶ 84, 102.)

On September 2, 2014, Wall and the Director of Associate Relations, Kim Burch, presented Sumner with a memorandum informing him that his position was being eliminated,

effective October 3, 2014, due to an effort to "improve efficiency" and "reduce costs." (*Id.* ¶ 101.) Although the positions of "low service employees with performance issues" were to be targeted for elimination, (*Id.* ¶ 102), the memorandum to Sumner did not reference any performance issues with Sumner. Sumner alleges that MWHP illegally removed him based on his age; his periods of FMLA leave; and, Wall's awareness of his status as a "high risk" individual.

**B.    Procedural History**

On January 21, 2015, Sumner filed his initial three-count Complaint. (ECF No. 1.) Count One alleged interference with rights granted by the FMLA; Count Two alleged retaliation in violation of the FMLA; and Count Three alleged retaliation in violation of the Affordable Care Act. After Defendants filed their original partial motion to dismiss, Sumner filed an Amended Complaint on April 3, 2015, eliminating Count Three of his original Complaint. (ECF No. 21.) Defendants then filed a partial motion to dismiss, asking the Court to dismiss Count One of the Amended Complaint. (ECF No. 23.) On April 28, 2015, the Court granted the motion and dismissed Count One, finding that Sumner failed to state a claim for interference with his FMLA rights. (ECF No. 27.) On June 11, 2015, the Defendants filed answers to the Amended Complaint. (ECF Nos. 31, 32.)

On November 13, 2015, five months after the Defendants filed their answers, Sumner filed a motion for leave to file a second amended complaint. (ECF No. 33.) Defendants did not object to the motion. (ECF No. 37.) On February 5, 2016, this Court[5] granted the motion, deeming Sumner's Second Amended Complaint filed. (ECF No. 39.) The Second Amended

---

[5] The Honorable James R. Spencer, United States District Judge, reassigned this action to the undersigned. (ECF No. 38.)

Complaint added five new claims. Including these new claims, the Second Amended Complaint alleges the following, all brought against MWHP except where noted:

Count One: Interference with Rights Granted by the FMLA (against MHWP and Wall). 29 U.S.C. § 2601, *et seq.* DISMISSED by May 28, 2015 Court Order (ECF No. 27);

Count Two: Retaliation in Violation of the FMLA (against MWHP and Will);

Count Three: Failure to accommodate, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("ADA");

Count Four: Hostile work environment, in violation of the ADA;

Count Five: Discriminatory termination, in violation of the ADA;

Count Six: Retaliation, in violation of the ADA; and,

Count Seven: Discriminatory termination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[6]

Wall filed an answer to the Second Amended Complaint. (ECF No. 42.) MWHP filed a Partial Motion to Dismiss Count Three, alleging failure to accommodate under the ADA, and Count Four, alleging the existence of a hostile work environment, also under the ADA.

### III. Analysis: MWHP's Partial Motion to Dismiss

Sumner offers extensive factual allegations that surround a core event: the termination of his employment with MWHP that was finalized in October 2014. Sumner contends that, once his employer knew of his medical difficulties, MWHP unlawfully discriminated against him at age 60, ultimately eliminating his position because of his disability and in retaliation for having taken FMLA leave in 2012 and 2014. For the reasons that follow, the Court will find that Counts

---

[6] The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Three and Four of Sumner's Second Amended Complaint fail to state a claim upon which relief can be granted, and will grant the Partial Motion to Dismiss.

### A.    Sumner Fails to State a Claim for Failure to Accommodate

Sumner fails to state a claim for failure to provide reasonable accommodation because he does not allege any accommodation that he requested and that MWHP refused. The Court will dismiss Count Three of the Second Amended Complaint.

### 1.    Applicable Law:  Failure to Accommodate

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Ainsworth v. Loudon Cty. Sch. Bd.*, 851 F. Supp. 2d 963, 978 (E.D. Va. 2012) (quoting 42 U.S.C. § 12112(a)). "Discrimination . . . prohibits not only disparate treatment because of an employee's disability, *see id.*, but also the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee or applicant] with a disability.'" *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 479 (4th Cir. 2010) (quoting 42 U.S.C. § 12112(a), (b)).

To establish a prima facie case for failure to accommodate under the ADA,[7] a plaintiff must show that: (1) he or she was a qualified person with a disability; (2) the employer had notice of the disability; (3) with reasonable accommodation he or she could perform the essential functions of the position; and, (4) the employer refused to make such accommodations. *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citation omitted). Although each element

---

[7] Courts apply the same analysis to claims for failure to accommodate under both the ADA and the Rehabilitation Act. *Lewis v. Gibson*, 621 F. App'x 163, 164 (4th Cir. 2015) (citing cases). Accordingly, the Court may rely upon the guidance of courts examining claims under either statute to analyze the elements of Sumner's failure to accommodate claim. *Id.*

involves a question of fact, *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994), to

survive a Rule 12(b)(6) motion to dismiss, a plaintiff must nevertheless allege facts sufficient to

state all the elements of a failure to accommodate claim. *See, e.g., Ainsworth*, 851 F. Supp. 2d at

981 (granting motion to dismiss ADA failure to accommodate claim when plaintiff did not allege

facts showing that "she requested a reasonable accommodation other than leave," or facts

showing that "such a request was ever denied.") (citing *Morgan v. Rowe Materials, LLC*, No.

3:08cv576, 2009 WL 1321514, at *3 (E.D. Va. May 11, 2009)).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of [an] individual; (B) a record of such impairment;

or[,] (C) being regard[ed] as having such impairment." *Jones v. HCA (Hosp. Corp. of Am.)*,

16 F. Supp. 3d 622, 631 (E.D. Va. 2014) (quoting 42 U.S.C. § 12102). A "qualified individual"

means an "individual with a disability who, with or without reasonable accommodation, can

perform the essential functions of the employment position." *Shin*, 369 F. App'x at 479 (quoting

42 U.S.C. § 12111(8)). The employee bears "the ultimate burden of persuasion with respect to

demonstrating that . . . an accommodation is reasonable." *Id.* at 481.

The employee also carries the burden "to both identify the need for and suggest an

appropriate accommodation." *Leschinsky v. Rectors & Visitors of Radford Univ.*, No.

7:11cv189, 2011 WL 5029813, at *2 (W.D. Va. Oct. 24, 2011) (citation omitted); *see also*

*Ainsworth*, 851 F. Supp. 2d at 981. After such a request, the employer should engage in an

"informal, interactive process," to identify a reasonable accommodation. *Wilson v. Dollar*

*General Corp.*, 717 F.3d 337, 346 (quoting 29 C.F.R. § 1630.2(o)(3)). A plaintiff cannot,

however, premise a failure to accommodate claim "'solely on the allegation that the employer

failed to engage in an interactive process.'" *Ainsworth*, 851 F. Supp. 2d at 981 (quoting *Walter*

11

*v. United Airlines, Inc.*, 232 F.3d 892, 2000 WL 1587489, at *4 (4th Cir. Oct. 25, 2000)). The employee must instead demonstrate that "the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." *Id.*; *see also Wilson*, 717 F.3d at 347. When an employee "is performing the job satisfactorily . . . [and] will not acknowledge the need for or request an accommodation, or let the employer know that an accommodation is insufficient," the employee cannot show that the employer refused to make an accommodation. *Shiflett v. GE Fanuc Automation Corp*, 151 F.3d 1030, 1998 WL 386116, at *8–9 (4th Cir. 1998) (unpublished). The ADA does not require an employer to "guess or read the employee's mind." *Id.*

For purposes of the motion to dismiss, MWHP does not contest that Sumner has adequately pleaded that he is a qualified individual with a disability; that MWHP had notice of his disability; or that, with reasonable accommodation, Sumner could perform the essential functions of the job. (Def.'s Mot. Dismiss 6.) Thus, in deciding whether Sumner states a claim for failure to accommodate, the sole issue before the Court is whether MWHP refused reasonable accommodations that Sumner requested. It did not.

### 2. Sumner's Failure to Accommodate Claim Fails Because He Does Not Allege that MWHP Refused Any Requested Accommodation

Sumner's failure to accommodate claim fails because, even viewing his factual allegations favorably, he does not allege that MWHP refused to grant any accommodation he requested. Sumner does not plausibly allege that he requested accommodation beyond the FMLA leave awarded, or that someone from MWHP violated the ADA by denying any additional accommodation Sumner sought.

The Court begins by determining what "reasonable accommodation" Sumner sought, a difficult task given the breadth of concerns raised in the thirty-six-page Second Amended

Complaint. Favorably reading the harms articulated, Sumner asserts a right to the following accommodations: (1) taking two periods of FMLA leave; (2) attending a 2014 meeting by phone to allow his foot to remain elevated before his second surgery; and, (3) working 20 hours per week, and only 20 hours, when he first returned from the 2014 surgery. None of Sumner's allegations support a claim for failure to accommodate. First, MWHP granted Sumner two periods of FMLA leave. Second, Sumner does not allege that he requested to attend the 2014 meeting telephonically. And third, MWHP granted Sumner a 20-hour workweek on return, and he does not allege that he requested accommodation beyond that.

As to the 2012 and 2014 periods of FMLA leave, the Second Amended Complaint cannot sustain an ADA accommodation claim, because Sumner "does not point to a single instance where [MWHP] denied [Sumner] leave." *Ainsworth*, 851 F. Supp. 2d at 980. Sumner establishes that he asked for, and received, FMLA leave in October 2012 and in March 2014 for surgery needed to treat diabetes-related injuries. Sumner took his first FMLA leave in October 2012 apparently without incident.

As to Sumner's second, March 2014, period of FMLA leave, even a most favorable reading of the Second Amended Complaint does not suggest that Wall refused to grant Sumner's request for leave. No doubt exists that Sumner was permitted to take his 2014 FMLA leave. Sumner contends only that he "felt pressured" to delay the surgery by a week, not that Wall forbade him to take his 2014 leave at the time scheduled. Sumner also reports that Wall's comments constituted only a "factor," albeit the "main" one, in delaying his surgery. Even construing the facts favorably to Sumner, this shows that any delay in Sumner's second surgery arose because of, among other things, Sumner's internalized sense of pressure, not because of

13

any refusal by Wall. Sumner does not allege facts to demonstrate that Wall refused, when he asked her to do so, to grant Sumner's FMLA leave without delay.

Sumner also contends that MWHP denied him reasonable accommodation when, during that one-week timeframe before his surgery, Wall verbally reprimanded him for telephonically participating in a 2014 phone call so that he could elevate his foot instead of attending it in person. Even a favorable reading of the Second Amended Complaint cannot support this claim for a failure to accommodate. Sumner does not allege that he told Wall or anyone else at MWHP that his disability required him to keep his foot elevated prior to surgery, nor does he contend that he told Wall he had to miss that meeting to do so. Without alleging the threshold requirement of requesting an accommodation, Sumner's claim necessarily fails. *Wilson*, 717 F.3d at 346–47. The ADA does not require an employer to "guess or read the employee's mind." *Shiflett*, 151 F.3d at *8–9.

Finally, Sumner challenges one aspect of the second period of FMLA leave he received in March 2014. Sumner used six weeks of FMLA leave to recuperate at home post-surgery, and then "returned to work . . . on a limited basis (20 hours per week) for the first two weeks, per doctor's orders." (Second Am. Compl ¶ 78.) However, Sumner asserts that Wall assigned overly burdensome tasks which "prevented him from adhering to" his modified schedule, negating this accommodation. (*Id.* ¶ 78.) This aspect of his failure to accommodate claim does not state a claim for relief as a matter of law.

First, Sumner's Second Amended Complaint alleges generally that Wall's education and background outside compensation and benefits "did not adequately prepare" Wall for her "job responsibilities" within it. (*Id.* ¶ 54.) Sumner also asserts that Wall "set inaccurate or difficult timelines" for a project in early 2012 because of her "inability to comprehend" the compensation

14

and benefits arena. (*Id.*)  It is not clear to this Court how Sumner can plausibly state a claim for lack of accommodation when it rests on conduct and ineptitude he alleges Wall exhibited even before knowing about his disability.

More directly, though, Sumner fails to state a claim of failure to accommodate because, having received a reduced schedule, he never plausibly alleges that he communicated to Wall that the deadlines and workload prevented him from adhering to that schedule.  An interactive dialogue could only arise after Sumner told Wall that the accommodation given was insufficient, and he asked for relief.[8]  *See Wilson*, 717 F.3d at 346–47.  Sumner never alleges that he, for instance, asked for additional staff or extended deadlines when he realized he had more than 20 hours of work per week.  The Court cannot find MWHP liable under the ADA for failing to provide accommodations Sumner does not allege it knew were necessary.  *Shiflett*, 1998 WL 386116, at *8–9.  The Court will grant MWHP's Motion to Dismiss Count Three of the Second Amended Complaint.

**B.      Sumner Fails to State a Claim for a Hostile Work Environment**

Sumner fails to state a claim for a hostile work environment because, even with a favorable reading, the discriminatory acts he outlines are neither severe nor pervasive enough to sustain such a claim.  The Court will dismiss Count Four of the Second Amended Complaint.

---

[8] Even if Sumner felt "pressure," MWHP cannot be liable for failing to modify his requested accommodations if it did not know the provided accommodations were wanting. "'Defendants should not suffer ADA liability because plaintiff was unduly reticent in communicating his problem, however "natural" his timidity might be.' . . . . The employer is entitled to notice before becoming liable for failure to accommodate." *Shiflett*, 1998 WL 386116, at *9 (quoting the district court).

1.    **Applicable Law:  Hostile Work Environment**

The ADA "creates a cause of action for hostile work environment harassment." *Fox v.*

*General Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) (citing cases).  To state a claim for a

hostile work environment under the ADA,[9] a plaintiff must allege facts sufficient to state each of

the following elements:

> (1) he [or she] is a qualified individual with a disability; (2) he [or she] was
> subjected to unwelcome harassment; (3) the harassment was based on his [or her]
> disability; (4) the harassment was sufficiently severe or pervasive to alter a term,
> condition, or privilege of employment; and[,] (5) some factual basis exists to
> impute liability for the harassment to the employer.

*Id.* at 177 (citing *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999)).

The examination of severity and pervasiveness involves both subjective and objective

analysis. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  First, the plaintiff

must personally perceive the environment to be "hostile or abusive." *Jones*, 16 F. Supp. 3d

at 630.  Second, the plaintiff must show that his or her perception was "reasonable." *Id.*;

*Brandford v. Shannon-Baum Signs*, No. RDB-11-836, 2012 WL 3542604, at *6 (D. Md. Aug.

15, 2012) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)), *aff'd*,

519 F. App'x 817 (4th Cir. 2013).  To determine the reasonableness of the plaintiff's perception,

courts look to a series of nonexclusive factors such as "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and[,] whether it unreasonably interferes with an employee's work performance."

*Harris v. Forklift Sys.*, 510 U.S. 17,  23 (1993).  No single factor is dispositive, and plaintiffs

---

[9] The ADA's cause of action for hostile work environment is "modeled after the Title VII
[of the Civil Rights Act of 1964] cause of action." *Fox*, 247 F.3d at 176 (citations omitted).
Accordingly, the Court may rely upon the guidance of courts examining ADA, Title VII, and
ADEA claims to analyze the elements of Sumner's hostile work environment claim. *Id.*

16

must meet a high standard to satisfy the severe or pervasive element of a hostile work environment claim. *Sunbelt Rentals*, 521 F.3d at 315.

Also, because "[w]orkplaces are not always harmonious locales," employment discrimination laws are not designed to create a "general civility code for the ... workplace." *Id.* at 315. "[E]ven incidents that would objectively give rise to bruised or wounded feelings," such as "rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under [employment discrimination laws]." *Id.* at 315–16 (citations and internal quotation marks omitted) (last alteration added). The Court ultimately should examine whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

Whether "harassment is sufficiently severe or pervasive enough is quintessentially a question of fact," *Shiflett*, 1998 WL 386116, at *4, so a plaintiff must "allege facts to support a claim for relief," *Bass*, 324 F.3d at 765 (affirming district court's dismissal of a hostile work environment claim when plaintiff failed to allege that the problems she had with her coworkers and supervisors rose to the severe or pervasive level actionable under Title VII and the ADA).[10]

---

[10] Even recognizing that the severity or pervasiveness of harassment can be a question of fact, district courts within the Fourth Circuit regularly grant motions to dismiss when appropriate. *See, e.g., Jones*, 16 F. Supp. 3d at 631 (granting a motion to dismiss claim for hostile work environment when the complaint did not "indicate a pattern of 'extremely abusive language' or otherwise pervasive conduct based on the plaintiff's [protected status.]" (citing *Miller v. Wash. Workplace, Inc.*, 298 F. Supp. 2d 364, 375 (E.D. Va. 2004)); *see also Rivera v. Prince William Cnty Sch. Bd.*, 1:09cv341, 2009 WL 2232746, at *1 (E.D. Va. 2009) (granting a motion to dismiss plaintiff's claim for hostile work environment because "[p]laintiff's

MWHP does not contest that Sumner has, for the purposes of the motion to dismiss, adequately pleaded that he is a qualified person with a disability; that the harassment was based on his disability; and, that some factual basis exists to impute liability to MWHP. (Def.'s Mot. Dismiss 10.) Thus, the Court must decide whether Sumner was subjected to "unwelcome harassment" that was "sufficiently severe or pervasive enough to alter the terms and conditions of employment." *Fox*, 247 F.3d at 177.

### 2. Sumner Fails to State a Claim for Hostile Work Environment Because the Allegations Fall Well Short of the Severity or Pervasiveness Required

Even construing the facts in the Second Amended Complaint in the light most favorable to Sumner, he fails to state a claim for a hostile work environment under the ADA. Sumner's allegations fall well short of the high bar that severe or pervasive conduct must clear to alter the conditions of employment. *Harris*, 510 U.S. at 21.

At the motion to dismiss stage, the Court takes as true Sumner's allegations that he subjectively perceived the environment to be unwelcome and hostile. *Jones*, 16 F. Supp. 3d at 630. Thus, the Court need determine whether Sumner's perceptions matched what a reasonable person would find hostile or abusive. An examination of the allegations in Sumner's complaint in light of the factors established by the Supreme Court of the United States in *Harris* plainly shows that Sumner alleges conduct closer to "a routine difference of opinion and personality conflict" between him and Wall, not one evincing a hostile workplace. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000).

---

complaints about her co-worker's boorish sporadic behavior spanning a seventeen-month period is insufficient to state a claim under Title VII.")).

First, the Second Amended Complaint does not detail "frequen[t] . . . discriminatory conduct." *Harris*, 510 U.S. at 23.  Sumner alleges two types of behavior by Wall that could plausibly be seen as recurring and unwelcome:  Wall's "circumvention" of Sumner's decisions; and Wall's lack of appreciation for Sumner's work.[11]  However, nothing Sumner alleges—taken alone or together—plausibly demonstrates a "pattern" of harassment of any kind. *Jones*, 16 F. Supp. 3d at 631.

Viewed favorably, Sumner identifies eight instances of circumvention:  (1) Between December 2007 and February 2008, Wall disregarded Sumner's advice about employee volunteerism; (2) In 2008, Wall set salaries without consulting Sumner; (3) Wall also made offers and hired people at salaries above their experience levels in 2008; (4) Wall attempted to remove salary determination from Sumner's control; (5) Wall routinely made requests of Sumner's subordinates instead of Sumner himself; (6) Wall reassigned one of Sumner's associates to another area without consulting Sumner; (7) In late 2012 through early 2013, Wall circumvented staffing procedures put in place by Sumner; and, (8) From 2012 to 2013, Wall resisted Sumner's advice by not implementing a procedure for clocking meal times.

Sumner also points to seven ways in which Wall did not appreciate his work or support him:  (1) During 2009, Wall "always supported Mr. Jensen," even when Jensen acted contrary to guidelines, (Second Am. Compl. ¶ 42); (2) Beginning in mid-2012, Wall reduced her meeting times with Sumner from weekly to every other week or even less frequently; (3) Wall "excluded Mr. Sumner from issues affecting his department," (*Id.* ¶ 51); (4) Between 2010 and 2012, Wall

---

[11] Sumner twice alleges that he was given the PIP "in retaliation" for taking FMLA leave. (Second Am. Compl. ¶¶ 84, 102.)  These allegations are more appropriately considered with Sumner's Count Two, retaliation under the FMLA, or Count Four, retaliation under the ADA. However, even considering the PIP as part of Wall's "harassing" conduct, Sumner does not allege a "pattern" of harassment.

failed to replace staff in Sumner's department when they left; (5) Wall did not recognize Sumner for his successful efforts on a large supplemental pay program project; (6) Wall "made no effort, whatsoever to check with Mr. Sumner regardless of his efforts or health," (*Id.* ¶ 91); and, (7) unlike other employees with whom she did correspond, Wall did not respond to Sumner's emails while she was on vacation.

Sumner cites no authority, and the Court finds none, holding that a supervisor overruling her subordinate's decisions, or failing to acknowledge his achievements, plausibly supports a claim for hostile work environment under the ADA. Even viewed favorably, Sumner fails to allege any facts showing that he was subjected to harassment severe enough to support a hostile work environment claim. Indeed, much of the conduct Sumner describes is consistent of a relationship between a supervisor and her subordinate, who are simply "constantly at odds." (*Id.* ¶ 39.) These allegations readily rise to "a routine difference of opinion and personality conflict" between Sumner and Wall, but they do not plausibly allege a pattern of harassment against Sumner by Wall. *See Hawkins*, 203 F.3d at 276,

Second, as to severity, the Second Amended Complaint is bereft of a single instance where someone used "extremely abusive language," *Jones*, 16 F. Supp. 3d at 631; "intimidation, ridicule, and insult," *Harris*, 510 U.S. at 21; "harshly derogatory terms," *Sunbelt Rentals*, 521 F.3d at 316; "verbal harassment," *Fox*, 247 F.3d at 179; or any of the other types of abuse courts have found severe enough to constitute a hostile work environment. Sumner does not even contend that Wall expressed something akin to a "mere offensive utterance." *Fox*, 247 F.3d at 177. Instead, Sumner points to three instances in which Wall expressed displeasure with him: (1) Wall became "visibly upset" with Sumner, (Second Am. Compl. ¶41); (2) Wall verbally reprimanded Sumner for not attending a meeting in person; and, (3) Wall became annoyed with

20

Sumner for being late to work. These three allegations, whether considered alone or together, fall far short of the severity required to sustain a hostile work environment claim, even on a motion to dismiss.

Finally, the Second Amended Complaint does not allege, much less plausibly so, any physical threat or humiliating conduct. Sumner fails to allege facts demonstrating that Wall's behavior unreasonably interfered with his work performance. To the contrary, Sumner suggests that the PIP was retaliatory because he performed well and had received only positive evaluations in the past.

Even a most generous reading of Sumner's factual allegation cannot show either severe or pervasive harassment in violation of the ADA. The Second Amended Complaint reveals neither "regular" nor "deeply repugnant" behavior directed toward Sumner as a result of his disability. *Rozier-Thompson v. Burlington Coat Factory Warehouse of Pocono Crossing, Inc.*, 3:05cv456, 2006 WL 1889651, at *6 (E.D. Va. July 7, 2006). Instead, Sumner outlines Wall "circumventing" his workplace expertise, both before and after Wall learned of Sumner's disability. Wall's failure to praise Sumner's work also cannot, as a matter of law, support a hostile work environment claim. Sumner's allegations cannot meet the "high standard" to state a claim for a hostile work environment under the ADA. *Sunbelt Rentals*, 521 F.3d at 315–16. The Court will dismiss Count IV.

## V.  Conclusion

For the foregoing reasons, the Court will grant MWHP's partial Motion to Dismiss.

(ECF No. 40.)  The Court will dismiss Counts Three and Four of the Second Amended

Complaint.  An appropriate Order shall issue.

_____/s/___
M. Hannah Lauck
United States District Judge

Date: SEP 3 0 2016
Richmond, Virginia

22